**Third trial for larceny — This was a different charge from the others — a distinct offense.**

## ALBANY OYER AND TERMINER.

### The People agt. Charles H. Phelps.

*Indictment for larceny from the state on another and distinct draft.*

The principal difference in the facts between this trial and the first and second one, *ante*, was that the draft sent to the comptroller for the payment of taxes, was not received in the treasurer's office by the prisoner personally, but was received and entered in the treasurer's books by another clerk, and by him deposited in the safe in the office, from which the prisoner took it.

*October* 16, 1874.

### Charge of Hon. Theodoric R. Westbrook.

*Gentlemen of the jury:* I desire your attention for a few minutes whilst I endeavor to present this case to you for your consideration. As you have heard the various questions raised by the counsel for the prisoner, and the motion for instructions to acquit him, and the several requests to charge, you have noticed that this case involves questions which may be reviewed hereafter. We have disposed of these questions according to our best judgment and according to our conscientious convictions. Your duty is not to set the court right if you think the court is wrong, but yours is simply to pass upon the questions of fact which the court will leave to you to consider, and you will be governed in your consideration of those questions of fact, by the rules of law which we shall lay down to you for your guidance.

The prisoner at the bar is indicted for the crime of grand larceny, it being charged in the indictment that he stole this draft, which I will read to you:

"First National Bank of Utica,
"Utica, N. Y., *August* 27, 1873.

"No. 63.   Metropolitan National Bank:

"Pay to the order of Wm. McPherson, county treasurer, four hundred dollars.

"$400.00.                          P. V. ROGERS,
"*Cashier.*"

And it is further charged that when he did steal this draft, it had been received at the office of the state treasurer in payment of taxes. I will have occasion by and by to refer to that question again.   Larceny is defined thus, and that you may understand the exact character of the crime, I beg to read to you this definition. . The definition I read from 2d *Wharton's Criminal Law*, section 1750: "The definitions of larceny," said baron PARKE, an eminent judge, " are none of them complete; Mr. East's is the most so, but that wants some little explanation.   His definition is, 'the wrongful or fraudulent taking and carrying away by any person of the mere personal goods of another from any place, with a felonious intent to convert them to his (the taker's) own use, and make them his own property without the consent of the owner.'   This is defective in not stating what the definition of 'felonious' in this definition is.   It may be explained to mean that there is no color of right or excuse for the act, and the intent must be to deprive the owner not temporarily but permanently of his property. Cases also show that the taking of goods with an intent to return them is not larceny."   That section, from this author's work, seems to me to cover the whole ground in defining the crime of larceny.   It is the wrongful and fraudulent taking of another's goods against the will of the owner, without any color of right, authority or excuse, with the intent to

appropriate these goods to the taker's own use permanently. Now, the first question then you have to dispose of in this case will be this: Did the prisoner at the bar take this draft? I repeat: Did the prisoner at the bar take this draft? You are to find this question, not the court. I intend to state to you the facts as I think the evidence shows the facts to be, but if I am wrong either in stating the evidence, or the facts which I think the evidence tends to prove, you must correct me, for you are to render your verdict upon this evidence, and not the court. As the evidence seems to be uncontradicted, perhaps there will be no injustice done to the prisoner, by my stating what I think the evidence settles, though I shall leave that as a question for you. Mr. William McPherson was county treasurer of the county of Oneida. He wished to pay the taxes due the state, and accordingly he sent this draft which I hold in my hand, and which I have read to you, in connection with several other drafts, to Mr. Nelson K. Hopkins, as comptroller, for the purpose of paying that tax. The draft was drawn by the First National Bank of Utica upon the Metropolitan National Bank of New York, and payable to the order of William McPherson, as county treasurer. Mr. McPherson indorsed the draft thus:

"Pay to the order of Nelson K. Hopkins, comptroller. W. McPherson, county treasurer."

That then is the first step toward tracing this draft to the prisoner. It is sent from the county of Oneida to the comptroller's office at Albany. Mr. Henry Gallien testified that the draft was received at the comptroller's office, and, in the ordinary course of business of that office, by this indorsement, which I will read to you, it was transferred to the office of the treasurer: "Pay order of state treasurer. Henry Gallien, second deputy." Then Mr. Wood, a clerk in the office of the treasurer, testifies from the entry of this draft upon the books, which entry is in his own handwriting, that he received that draft in the treasurer's office, and very probably put it in the drawer of the safe, which was used as the money drawer,

where he was accustomed to put drafts when received in the absence of Mr. Phelps, and that Mr. Phelps took it from there, as he supposes. At all events, this draft was in the hands of Mr. Phelps, as clerk. That is proved, not by the evidence of any person who saw it actually in his hands, but by his own sign manual on the back of it, which is as follows: "Pay Charles Hudson, Esq., cashier, or order. State treasurer, per Charles H. Phelps, cashier." It is proved by Mr. Wood, and also I think by Mr. Gallien, that the whole of that indorsement, except the words "pay," "cashier, or order," is in the handwriting of Mr. Phelps, so that its actual handling by the prisoner is shown by this indorsement. And from this fact, also, is to be derived the evidence of its conversion to his own use. As a clerk in that office, he had no discretion as to the use of this money. It was his duty to deposit that draft in one of the designated banks of deposit in this city, so that the state could have the benefit of the money. The bank primarily for the purpose, was the Commercial Bank of the city. Instead, however, of doing this, he sends it, as we infer from its reception in New York, and from the indorsements, to Mr. F. R. Sherwin, a broker in New York, and makes it payable to Charles Hudson, who is the cashier of F. R. Sherwin, who seems to be a reputable gentleman, and who has remained here to give his evidence, whilst his former employer has gone abroad. It would seem from the evidence of Hudson, that a deposit ticket was made up of this and several other items, and it was taken and deposited in the Bank of North America. The witnesses do not swear that they remember it actually went there, but from marks on this check, and from the deposit ticket, the receiving teller of the bank has no doubt it passed through that bank. At all events a draft to the amount of $400, or check to the amount of $400, on the Metropolitan Bank of New York, was deposited in the Bank of North America on that day, the 6th of September, 1873, from F. R. Sherwin, and I leave it to you to say, in the absence of any explanation on the

part of the prisoner, whether it is not a legitimate and proper inference from this evidence that this was the identical draft. At all events it is admitted in this case that this draft had not gone into the state treasury. It was not deposited in either of the banks, and the people of this state have not had the benefit of this money which was raised for the purpose of paying into the treasury of the state. It went elsewhere than where the law and the duty of the prisoner required it to go. He had no right to indorse this draft in the way he did and send, or cause it to be sent, to the city of New York for any purpose, and I charge you that if you find that he indorsed this draft, " Pay Charles Hudson, Esq., cashier, or order," and sent it away for the purpose of being paid to the order of Mr. Hudson, then it was a conversion, and a taking by him of the property. Now, you are to find these facts. You are to say whether there be any escape from the clear proof on this point. I have given you the facts as I understand them. Of course you have the right to differ from me, but, gentlemen, you must find your difference from the evidence. You have taken your oaths to be governed and guided by it, and I am sure neither one of you will forget its obligation.

Then the next question, if you find the prisoner took the draft, you are to find with what intent he took it, and you are to say whether he took it feloniously, whether without color of right or authority, intending to deprive the owner of it permanently, and against the will of the owner. Well, if it was taken, I know of no evidence in the case which shows this was taken with the owner's will. There is no person in this broad state that could give him the right to take it and use it for his own purposes, if he did take it and use it for his own purposes. I know of no evidence in the case, if there is you will find it, which shows that any officer of the state authorized him to take it; and you are further to say, from the evidence, what color of right or excuse did he have for placing this indorsement upon this

People agt. Phelps.

draft, and causing it to be paid to the order of Charles Hudson. No instruction which he had received, so far as the court knows from the evidence, justified it. On the contrary, it was against his instructions, the evidence of Mr. Raines is, to send the draft where he sent it, and to indorse it as he did indorse it, if you find the evidence to be as I have detailed. There is also another piece of evidence in the case. I refer to the letter testified to by Mr. Raines, which seems to imply that the prisoner did not pretend he had any permission to do the act, because he writes to Mr. Raines to apologize for using the money of the state, and hopes to be able by and by to return the money. You are to say, if he took the draft, with what intent he took it. Did he take it without color of excuse, and intend to deprive the owner of it permanently? There are cases where, if a person takes the property of the owner against his will, the intent to commit larceny could not be inferred. If a man takes your horse to ride a little way, and intending to return and returns it, that is no larceny, if the jury is satisfied he had no intent to take the property permanently; but you are to look at each case by itself, and form your judgment of the intent from the surrounding circumstances. Now, if I should go up to your horse, and deliberately draw a pistol and shoot the horse and kill it, everyone would say I meant to do exactly what I did do. If the prisoner at the bar took this draft and used it, and put it beyond his power to return, then, gentlemen, I submit to you that the natural inference to be drawn is, that he designed to deprive the state of the draft permanently. Much has been said in regard to the prisoner's intent to restore the money. Restoration of the money would not restore the property taken, and for that reason alone he could not be justified; but there are other circumstances in the case which tend to show that this point is not, for the purpose of the trial, well taken, if you find the facts as I have stated them. Is there any effort shown on the part of the prisoner to return the money? Did he confess in Jersey City

that he could only return part in thirty days, and the balance in two or three months? Did he refuse to tell where a part of the money of the state was? I charge you, then, gentlemen, that if he actually converted this draft into money, if it is not shown that he had the pecuniary ability to return this money at once; if it be shown further he confessed he was unable to return the money, and that he refused to disclose where it was, then his pretended ability that he hoped to be able to return the money at some future day, cannot be any defense against this indictment. Now, in regard to these facts which I have stated thus plumply and roundly, you are to look over the evidence and say whether I have omitted to state any thing, or whether the evidence is contrary to what I have mentioned. I have endeavored to give it to you fairly as I understand it to be.

A good deal has been said in the case in regard to the prisoner being the possessor of the draft, and because he was the possessor thereof he could not be convicted of crime of larceny. It is true as a legal proposition that before a person can be convicted of larceny for taking the goods of some other person, the owner must have had possession of the property, and if the draft never had come into the actual possession of the state, then the prisoner could not be convicted. There has been some curious learning displayed on the question, and I want to read you some. I read from *Wharton's Criminal Law*, section 1860 : " It will be seen where goods are delivered to a servant for his master, and the servant steals the goods before they have arrived in the master's possession, this is no felony at common law, though it is otherwise when the goods have reached their place of destination, when constructively the possession of the master begins. What then is the place of destination? It is reached when the goods have been placed in the master's wagon, even though it is driven by the servant, and if, after this, the servant steals them from this wagon, it is larceny." Again, I read from section 1846 : " When a clerk is in possession, but without any discretion,

under explicit directions, in such case he is the bare servant, and the possession is that of his employers, and if he steals the goods he is guilty of larceny. Thus a confidential clerk of a merchant who had authority to get his master's bills discounted and had the general management of his cash concerns, took a bill of exchange unindorsed, got it discounted, and absconded with the produce of it; the offense was held larceny." I charge you as the law that if the prisoner had the possession of the property in the sense in which criminal authors use the word " possession," then he could not be convicted of larceny; but, and you will pay attention here, if you find from the evidence in this case that this draft was first sent to Nelson K. Hopkins, the comptroller of the state, and was received there in the office by him as comptroller, if it was then indorsed by Henry Gallien, as second deputy comptroller, and sent to the office of the state treasurer, and there received by Mr. Wood in the office of the state treasurer; that Mr. Wood entered this draft upon the daily cash receipts of the office, or rather upon the book of the daily cash receipts, as having been received, and then forwarded this receipt:

" STATE OF NEW YORK, ⎱<br>
   " TREASURER'S OFFICE. ⎰

" $1,285.25. Received from W. McPherson, county treasurer of Oneida, $1,285.25, on account of state tax.

" FULTON PAUL.<br>
" HENRY GALLIEN,<br>
   " Second Deputy Comptroller."

Then I charge you that the prisoner had not the possession of that draft in such a sense that he could not be convicted of the crime of larceny. On the contrary, I charge you that if this draft was received at comptroller's office, sent from there to the treasurer's office, received there by the clerk Wood, entered by Wood upon the book of the daily cash receipts, and this receipt forwarded for it, then in law the prisoner had

not the possession of the draft, but it was in the possession of the state, and when he took it and converted it to his own use, if he did so with the intent to convert it permanently to his own use against the owner's will, he is guilty of the crime of larceny whereof he stands indicted.

I know of no other question of fact in this case to be left to you other than these three: Did the prisoner take the draft? Did he take it without color of right, authority, or excuse, against the will of the owner, intending to appropriate it to his own use permanently? Was it sent to the state comptroller and received by him, transferred thence to the office of the treasurer, by delivery to Mr. Wood, the clerk, entered upon the books of the office, and a receipt forwarded? If you answer all these questions in the affirmative, you must find the prisoner guilty; if either one of them you find in the negative, you will find him not guilty. Now, gentlemen, you have no right arbitrarily to reject sworn evidence. You cannot say I refuse to believe that, upon my mere notion, without any sort of reason for it. It will be a violation of your oaths so to do. If the evidence points to the prisoner's guilt, beyond a reasonable doubt, you must convict him. It is necessary, in a case free from reasonable doubt, that you should do so, that the law may be a terror to evil doers; if not free from reasonable doubt, you will acquit him, because the innocent should not suffer.

I had omitted to charge one proposition counsel requested. If you find the facts in regard to the draft to be as I have mentioned, that it was delivered to the comptroller and transferred to the treasurer's office as I have detailed, then it matters not when the intent to steal the draft was formed, if when Phelps first saw it, or at any time. It is enough that he took it at any time, without color of right or authority, against the will of the owner, intending permanently to convert it to his own use.